IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| GAR ENERGY AND ASSOCIATES, INC., et al., <br><br> Plaintiffs, <br><br> v. <br><br> IVANHOE ENERGY INC., et al., <br><br> Defendants. | Case No.: 1:11-CV-00907 AWI JLT <br><br> ORDER DENYING PLAINTIFFS' MOTION TO REMAND <br><br> (Doc. 33) <br><br> FINDINGS AND RECOMMENDATION GRANTING MOTION TO COMPEL ARBITRATION <br><br> (Doc. 51) |

Plaintiffs GAR Energy and Associates, Inc.; Gonzalo A. Ruiz and Janis S. Ruiz, as successors in interests to and assignees of GAR Energy (collectively, "Plaintiffs") seek an order remanding the action to Kern County Superior Court, which Defendants oppose.  Defendant Ivanhoe Energy (Latin America), Inc. seeks to compel arbitration in the matter, which Plaintiffs oppose. Pursuant to 28 U.S.C. §636(b)(1)(A), the motions to remand the action and to compel arbitration were referred to the Magistrate Judge assigned to this matter.

For the following reasons, the Court recommends Plaintiffs' motion to remand be **DENIED** and the motion to compel arbitration be **GRANTED**.

///

///

///

1

**I.  FACTUAL AND PROCEDURAL HISTORY**[1]

In November 2004, Ivanhoe Energy executed a Consulting Agreement for GAR Energy to serve as a consultant for the purpose of obtaining rights to develop oil reserves in Columbia. (Doc. 33-1 at 2).  On April 28, 2005, Ivanhoe notified GAR,

> Ivanhoe is arranging, for accounting and other reasons, its various operations under different Ivanhoe subsidiaries on a geographical basis.  In the case of Latin America, Ivanhoe has organized Ivanhoe Energy (Latin America) Inc.

(Doc. 49-1 at 49) Also, Ivanhoe notified GAR that it was assigning the rights and obligations under the Consulting Agreement to Ivanhoe Energy (Latin America) ("IE(LA)." *Id*.  This same writing, the parties' memorialized their agreement that the Consulting Agreement would be expanded to other "new areas" in Columbia. *Id*.   In the meantime, on February 3, 2005, the parties had entered into a separate confidentiality agreement related to the "new areas." *Id*. at 50.  However, the April 28, 2005 amendment to the Consulting Agreement, activated the confidentiality agreement set forth in the Consulting Agreement as to the "new areas." *Id*.  As a result, the parties terminated the February 3, 2005 confidentiality agreement. *Id*.

On June 2, 2005, Ivanhoe Energy and GAR Energy agreed that the terms of the Consulting Agreement would extend to specified oil fields in Ecuador. (Doc. 49-1 at 53) In this amendment, the parties agreed that the confidentiality provisions of the Consulting Agreement would apply to the efforts made in Ecuador. *Id.*

As relevant here, the Consulting Agreement as amended, sets forth the services GAR was to provide to Ivanhoe.  (Doc. 49-1 at 39-40.)  In particular, GAR was to provide information to establish business contacts in Ecuador including contacts within "key departments, agencies within Ecopetrol and the Government of [Ecuador] and their officials, personnel, ministries and departments in the areas of oil and gas exploration, development and productions." *Id*., *Id*. at 53. The Agreement's confidentiality agreement required the parties to "keep strictly confidential and shall not disclose any information concerning this agreement of the confidential business, operations,

---

[1] The facts provided herein are not adopted by the Court, but rather provided for background information relevant to Plaintiffs' allegations and the arbitration agreement.

or affairs of the other Party, regardless of how or when the other Party acquires such information, except" in certain instances including disclosure to "an Affiliate of the Company or Consultant." (Doc. 49-1 at 43)  The parties agreed that each would "act in good faith towards one another." *Id* at 42.  In exchange for GAR's services, Ivanhoe Energy agreed to pay GAR for its "material" assistance in gaining permission to explore for heavy oil in certain parts of Ecuador. (Doc. 49-1 at 40) Payment was due upon the effective date of Ivanhoe entering into a venture with Ecopetrol. *Id*. Notably, the agreement allowed itself to be modified "only by a written instrument duly signed by both the Company and Consultant."  (Doc. 49-1 at 45.)

On June 2, 2005 and again on June 8, 2005, IE(LA) issued GAR a letter attesting that GAR had the right to represent it as well as the "affiliated companies" of Ivanhoe to obtain oil and gas exploration opportunities in Ecuador.  (Doc. 49-1 at 56; Doc. 49-1 at 58) In particular, this authorization reads,

> This letter will evidence that GAR Energy & Associates, Inc. **has contracted to represent Ivanhoe Energy (Latin America) Inc., and affiliated companies ("Ivanhoe") in connection with Ivanhoe,** either alone or with other companies, obtaining opportunities and rights for exploration, development and exploitation of oil and gas in Colombia and Ecuador.
>
> You are permitted to show this letter to persons and organizations that you may contact for purposes of evidencing your representation of Ivanhoe Energy (Latin America) Inc. as stated.

*Id*., emphasis added.

On June 8, 2005, much like they had done as to the "new areas" identified in Columbia, the parties executed a separate Confidentiality Agreement as to the Ecuadorean efforts. (Doc. 49-1 at 60) The Agreement specified that it was between GAR and IE(LA) but noted that IE(LA) "is a wholly-owned subsidiary of Ivanhoe Energy Inc., a Yukon, Canada corporation." *Id*.  The Confidentiality Agreement restricted IE(LA)'s ability to disclose information received from GAR related to the efforts to locate oil and gas exploration opportunities in Ecuador. *Id*.  Moreover, the parties agreed that IE(LA) could disclose the information to "affiliated" companies provided that IE(LA) guaranteed that those receiving the information would adhere to the confidentiality requirements. *Id*. at 60-61.  Interestingly, though IE(LA) gained no ownership interest in the confidential information, it could be shared with "employees, officers and directors" of IE(LA) or any affiliated company or to

"any entity funding or proposing to fund" IE(LA)'s oil and gas exploration opportunities in Ecudaor. *Id*. Before doing so, however, IE(LA) had to "obtain an undertaking of confidentiality, enforceable **by both the Disclosing Party and the Receiving Party, substantially in the same form and content as this Agreement** . . ." *Id*., emphasis added.

Moreover, the agreement contains a "non circumvention" agreement in which the parties agreed that neither would circumvent the other "regarding obtaining or acquiring an interest or rights in petroleum exploration and exploitation in the Area without the express written permission of the other Party." Doc. 49-1 at 61. This confidentiality agreement "supersedes [sic] and cancels all prior communications, understandings and agreement between the Parties hereto relating to the Confidential Information, whether written or oral, expressed or implied. *Id*. at 61-62.

Keenly at issue here is the agreement to arbitrate set forth in the confidentiality agreement which reads,

> Any dispute arising out of or relating to this Agreement, including any question regarding its existence, validity or termination, which cannot be amicably resolved by the Parties, shall be settled before a panel of three arbitrators, one selected by each of the Parties and the third by the arbitrators selected by the Parties, in accordance with the Arbitration Rules of the American Arbitration Society in Bakersfield, California. The resulting arbitral award shall be final and binding without right of appeal, and judgment upon such award may be entered in any court having jurisdiction thereof. A dispute shall be deemed to have arisen when either Party notifies the other Party in writing to that effect.

(Doc. 49-1 at 61).

According to Plaintiffs, "GAR Energy fulfilled its side of the bargain by providing advice and assistance concerning the opportunity in Ecuador, identifying key contacts, establishing business contacts, providing advice in business and negotiation strategy in obtaining negotiating agreements, and providing Ivanhoe with important technical and commercial information concerning oil fields in Ecuador." (Doc. 33-1 at 3). Plaintiffs assert Ivanhoe Energy breached the consulting agreement, and "created two new, wholly-owned subsidiaries, Ivanhoe Energy Latin America Inc. and Ivanhoe Energy Ecuador Inc., as a part of a claim to circumvent and evade its obligations to GAR Energy." *Id.* at 3-4.

Believing the agreements between the parties were breached, Plaintiff served an arbitration demand on Defendants on December 30, 2010. (Doc. 33-1 at 4; Doc. 51-1 at 5). In the demand for

arbitration, Plaintiffs alleged Defendants breached the Consulting Agreement and the Confidentiality Agreement, and "alleged claims for declaratory judgment, fraud, and breach of the implied covenant of good faith and fair dealing." (Doc. 55-1 at 5). Finding the American Arbitration Society did not exist, the parties attempted to reach an agreement on an arbitration procedure. (Doc. 33-1 at 4; Doc. 51-1 at 6). On March 11, 2022, Plaintiffs sent Defendant a written notice withdrawing the arbitration demand, and filed a complaint in Kern County Superior Court in Case No. S-1500-CV-273163.[2]

On June 3, 2011, Defendants filed a notice of removal of the action, thereby commencing the action in this Court. (Doc. 1). On July 5, 2011, Plaintiffs filed a motion to remand the action to the state court, asserting the Court lacks jurisdiction. (Doc. 33). Defendants filed an opposition on August 17, 2011 (Doc. 49), to which Plaintiff replied on September 8, 2011 (Doc. 56). Defendant Ivanhoe Energy (Latin America), Inc. filed a motion to compel arbitration (Doc. 51), to which Plaintiff filed an opposition on December 6, 2011 (Doc. 66). Ivanhoe Energy (Latin America) filed its reply on December 13, 2011 (Doc. 67).

## II.  MOTION TO REMAND

Defendants assert that removal of the matter is proper pursuant to the Convention on the Recognition and Enforcement of Foreign Arbitral Awards ("FAA"), 9 U.S.C. §§ 203 and 205.[3] (Doc. 1 at 3-5). Importantly, "[b]efore considering [a] motion to compel arbitration, the court must consider whether removal under section 205 was proper. If removal was improper, this court lacks subject matter jurisdiction to adjudicate [the] motion." *Hawkins v. KMPG LLP*, 423 F.Supp.2d 1038, 1042 (N.D. Cal. 2006). Accordingly, the Court must first adjudicate Plaintiff's motion to

---

[2] The Court may take notice of facts that are capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned. Fed. R. Evid. 201(b); *United States v. Bernal-Obeso*, 989 F.2d 331, 333 (9th Cir. 1993). The record of state court proceeding is a source whose accuracy cannot reasonably be questioned, and judicial notice may be taken of court records. *Mullis v. United States Bank. Ct.*, 828 F.2d 1385, 1388 n.9 (9th Cir. 1987); *Valerio v. Boise Cascade Corp.*, 80 F.R.D. 626, 635 n. 1 (N.D.Cal.1978), *aff'd*, 645 F.2d 699 (9th Cir. 1981); *see also Colonial Penn Ins. Co. v. Coil*, 887 F.2d 1236, 1239 (4th Cir. 1989); *Rodic v. Thistledown Racing Club, Inc.*, 615 F.2d 736, 738 (6th. Cir. 1980). Therefore, judicial notice is taken of the court's docket and documents filed by the parties in Case No. S-1500-CV-273163.

[3] Defendants assert this Court has jurisdiction based upon the parties' diversity of citizenship. There is great dispute between the parties over whether this is the correct. However, because the Court finds that it has jurisdiction under the FAA, it does not now decide whether jurisdiction may be based on the parties' citizenship.

remand to determine whether the Court has jurisdiction, which is determined "on the basis of the pleadings filed at the time of removal without reference to subsequent amendments." *Sparta Surgical Corp. v. Nat'l Ass'n of Securities Dealers, Inc.*, 159 F.3d 1209, 1213 (9th Cir. 1988).

### A. Legal Standard

Pursuant to 28 U.S.C. § 1441(a), a defendant has the right to remove a matter to federal court where the district court would have original jurisdiction. *Caterpillar, Inc. v. Williams*, 482 U.S. 286, 392 (1987). Specifically, the statute provides:

> Except otherwise expressly provided by Act of Congress, any civil action brought in a State court of which the district courts of the United States have original jurisdiction, may be removed by the defendant or defendants, to the district court of the United States for the district and division embracing the place where such action is pending.

28 U.S.C. § 1441(a). District courts have "original jurisdiction of all civil actions arising under the Constitution, laws, or treaties of the United States." 28 U.S.C. at § 1331. The Court may remand an action to state court for lack of subject matter jurisdiction or for defect in the removal procedure. 28 U.S.C. § 1447(c).

Removal statutes are to be strictly construed, and any doubts are to be resolved in favor of state court jurisdiction and remand. *See Gaus v. Miles*, 980 F.2d 564, 566 (9th Cir. 1992). The Court may remand an action to state court for lack of subject matter jurisdiction or for defect in the removal procedure. 28 U.S.C. § 1447(c). The party seeking removal bears the burden of proving its propriety. *Duncan v. Stuetzle*, 76 F.3d 1480, 1485 (9th Cir. 1996); *Abrego v. Dow Chem. Co.*, 443 F.3d 676, 683-85 (9th Cir. 2006); *see also Calif. ex. rel. Lockyer v. Dynegy, Inc.*, 375 F.3d 831, 838 (9th Cir. 2004) ("the burden of establishing federal jurisdiction falls to the party invoking the statute").

### B. Discussion and Analysis

By statute, district courts have original jurisdiction over "[a]n action or proceeding falling under the Convention . . . regardless of the amount in controversy." 9 U.S.C. §203. The FAA provides defendants have a right to remove a matter to the district court as follows:

> Where the subject matter of an action or proceeding pending in a State court relates to an arbitration agreement or award falling under the Convention, the defendant or defendants may, at any time before trial thereof, remove such action or proceeding to the

> district court of the United States for the district and division embracing the place where the action or proceeding is pending.

9 U.S.C. § 205. Significantly, the Court is not required to evaluate the validity of the arbitration agreement prior to assuming jurisdiction over the matter. *See Bautista v. Star Cruises*, 396 F.3d 1289, 1301 (11th Cir. 2005) (finding the FAA requires a "limited jurisdictional inquiry" and that "Section 205 does not require a district court to review the putative arbitration agreement . . . before assuming jurisdiction"), *cert. dismissed*, 545 U.S. 1136 (2005). Consequently, to establish removal was proper under the FAA, Defendants must establish only that the arbitration agreement 'falls under' the FAA and the dispute 'relates to' the arbitration agreement.

### 1. The arbitration agreement "falls under" the FAA

Pursuant to 9 U.S.C. § 202, "[a]n arbitration agreement . . . arising out of a legal relationship, whether contractual or not, which is considered as commercial, including a transaction, contract, or agreement described in section 2 of this title, falls under the Convention." Significantly, "Plaintiffs do not dispute that the arbitration agreement 'falls under' the Convention within the meaning of 9 U.S.C. § 202." (Doc. 33-1 at 6). Therefore, the Court finds the arbitration agreement "falls under" the FAA.

### 2. The dispute "relates to" the arbitration agreement

Recently, the Ninth Circuit observed that "[t]he phrase 'relates to' is plainly broad." *Infuturia Global Ltd. v. Sequus Pharms., Inc.*, 631 F.3d 1133, 1138 (9th Cir. 2011). The Ninth Circuit explained, "Because an arbitration agreement or award falling under the Convention 'relates to' the subject matter of an action whenever it could conceivably affect the outcome of the plaintiff's suit, a district court does have removal jurisdiction" "over a case where the defendant raises an affirmative defense related to an arbitral award falling under the Convention." *Id.* at 1135, 1138 (citing *Beiser v. Weyler*, 284 F.3d 665, 669 (5th Cir. 2002)) ("[W]henever an arbitration agreement falling under the Convention could *conceivably* affect the outcome of the plaintiff's case, the agreement 'relates to' the plaintiff's suit. Thus, the district court will have jurisdiction under § 205 over just about any suit in which a defendant contends that an arbitration clause falling under the Convention provides a defense."). The "relates to" element has been described as a "low bar" for

involving the FAA. Indeed, in *Infuturia*, the Ninth Circuit relied heavily upon *Beiser*, 284 F.3d at 669, which held,

> [Federal courts] will have jurisdiction under § 205 over just about any suit in which a defendant contends that an arbitration clause falling under the Convention provides a defense. As long as the defendant's assertion is not completely absurd or impossible, it is at least conceivable that the arbitration clause will impact the disposition of the case. That is all that is required to meet the low bar of 'relates to.'

*Infuturia*, at 1138.

Nevertheless, Plaintiffs argue the lawsuit does not "relate to" the arbitration agreement because "[i]f the arbitration agreement is irrelevant or unenforceable, it cannot be the basis for removal." (Doc. 33-1 at 6). According to Plaintiffs,

> Defendants have not met their burden under 9. U.S.C. 205 because they have not sought to enforce the arbitration agreement and there is no reason to believe that they have any intention of ever doing so. Plaintiffs filed this suit in state court after months of unsuccessful efforts to enter into a new agreement to arbitrate with Defendants. Such efforts were necessary only because Defendants took the position that the arbitration agreement in the Confidentiality Agreement (which they drafted) is unenforceable because the "American Arbitration Society" does not exist. Consistent with their prior conduct, Defendants have taken no action in this Court or in the state court to enforce the arbitration agreement. Obviously, if no party is seeking to enforce the arbitration agreement, then it cannot affect the outcome of this case.

(Doc. 33-1 at 6) (emphasis omitted). Therefore, Plaintiff concluded Defendants "asserted the arbitration agreement only as a pretense for removal." *Id*.

Significantly, since filing of Plaintiff's complaint in the state court, Defendants have raised the issue of the arbitration agreement repeatedly. In the answer to Plaintiff's Complaint, defendants Ivanhoe Energy and Ivanhoe Energy (Latin America) raised the arbitration agreement as an affirmative defense: "The Confidentiality Agreement between Plaintiff GAR Energy & Associates, Inc. and Defendant Ivanhoe Energy (Latin America) Inc. expressly provides for arbitration of disputes of the type alleged in the Complaint. Plaintiffs have failed to comply with the agreement to arbitrate and this litigation should therefore be precluded."[4] (Notice of Removal, Exh. 5, Doc. 5-4 at 4-5). Defendants "reserve[d] their right to demand arbitration at an appropriate time," (Doc. 5-4 at 5; Doc. 36 at 17) and argued that there is "no time limitation on a removing defendant to file a

---

[4] After Plaintiffs filed the First Amended Complaint (Doc. 26) on June 24, 2011, defendants Ivanhoe Energy and Ivanhoe Energy (Latin America) again raised the arbitration agreement as an affirmative defense. (Doc. 36 at 17).

motion to compel arbitration. Rather [the "relates to" test] requires only that a defendant possess a right to compel arbitration under a written agreement falling under the Convention." (Doc. 49 at 10). On August 3, 2011, defendant Ivanhoe Energy (Latin America) filed a motion to compel arbitration. (Doc. 51). Therefore, Plaintiffs' arguments that Defendants included the arbitration agreement as a "pretense for removal" and did not intend to enforce are not determinative.

For purposes of jurisdiction, it is sufficient that Defendants raised the arbitration agreement as an affirmative defense in response to Plaintiffs' allegations of breaches of the Confidentiality Agreement and Consulting Agreement, and the arbitration agreement could conceivably affect the outcome of the case. *Infuturia*, 631 F.3d at 1138. As a result, the Court had jurisdiction over the matter at the time of removal pursuant to the FAA. *See Pullman Co. v. Jenkins*, 305 U.S. 534, 437 (1939) (propriety of removal is determined by the operative pleadings at the time of removal); *see also Sparta Surgical Corp.*, 159 F.3d at 1213. Accordingly, Plaintiffs' motion to remand the action to the state court is **DENIED**.

### III. MOTION TO COMPEL ARBITRATION

Having determined that the Court has jurisdiction over the matter, the Court turns now to the motion to compel arbitration filed by defendant Ivanhoe Energy (Latin America). It is well-established that "arbitration provides a forum for resolving disputes more expeditiously and with greater flexibility than litigation." *Lifescan, Inc. v. Premier Diabetic Servs., Inc.*, 363 F.3d 1010, 1011 (9th Cir. 2004) (citation omitted).

#### A.     Legal Standard

The FAA provides that written arbitration agreements "shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract." 9 U.S.C. § 2. The Court's role in applying the FAA is "limited to determining whether a valid agreement to arbitrate exists and, if so, whether the agreement encompasses the dispute as issue." *Lifescan*, 363 F.3d at 1012. "[A]ny doubts concerning the scope of arbitrable issues should be resolved in favor of arbitration." *Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 24-25 (1983). As a result, "there is a presumption of arbitrability" and arbitration should only be denied when "it may be said with positive assurance that the arbitration clause is not susceptible of

an interpretation that covers the asserted dispute." *AT&T Tech., Inc. v. Communs. Workers of Am.*, 475 U.S. 643, 650 (1986) (citation omitted).

### B.  Discussion and Analysis

#### 1.  The arbitration agreement is valid under California law.

"In determining the validity of an agreement to arbitrate, federal courts 'should apply ordinary state-law principles that govern the formation of contracts.'" *Circuit City Stores v. Adams*, 279 F.3d 889, 892 (9th Cir. 2002) (quoting *First Options of Chicago, Inc. v. Kaplan*, 514 U.S. 938, 944 (1995)). As noted above, the Confidentiality Agreement contained a choice-of-law provision in which the parties agreed to apply "the substantive law of the State of California" to the agreement. (Doc. 26, Exh. F at 4). Pursuant to California contract law, the elements for a viable contract are "(1) parties capable of contracting; (2) their consent; (3) a lawful object; and (4) sufficient cause or consideration." *United States ex rel. Oliver v. Parsons Co.*, 195 F.3d 457, 462 (9th Cir. 1999) (citing Cal. Civ. Code § 1550; *Marshall & Co. v. Weisel*, 242 Cal. App. 2d 191, 196 (1966)). Under California law, an arbitration agreement may only be invalidated for the same reasons as other contracts. Cal. Code Civ. Proc. § 1281.

Here, there is no question that the parties were capable of contracting and consented to arbitration of disputes arising from or relating to the Confidentiality Agreement. Further, there can be no dispute that the arbitration agreement was supported by sufficient consideration. *See Circuit City Stores, Inc. v. Najd*, 294 F.3d 1104, 1108 (9th Cir. 2002) (a promise to be bound by the arbitration process itself serves as adequate consideration); *see also Strotz v. Dean Witter Reynolds*, 223 Cal. App. 3d 208, 216 (1990) ("Where an agreement to arbitrate exists, the parties' mutual promises to forego a judicial determination and to arbitrate their disputes provide consideration for each other"). The "paramount consideration" is "the parties' objective intention at the time of contracting." *Porreco v. Red Top RV Center*, 216 Cal. App. 3d 113, 119 (1989). Here, it is clear that at the making of the Agreement, the parties intended that disputes would be resolved through arbitration and that it would apply to "[a]ny dispute arising out of or relating to" the Confidentiality Agreement. Given these considerations, the Court finds the agreement to arbitrate is valid under California law.

However, in the arbitration agreement, the parties agree arbitration shall occur "in accordance with the Arbitration Rules of the American Arbitration Society in Bakersfield, California." (Doc. 26, Exh. F at 4). The parties assert the American Arbitration Society does not exist. Indeed at the hearing on this matter, counsel confirmed that the American Arbitration Society existed in Bakersfield only until 1926. Thus, the issue is whether this clause renders the arbitration agreement unenforceable.

### a. *The defense of impossibility is inapplicable.*[5]

"California law has long recognized that impossibility of performance will excuse a party's performance under a contract." (Doc. 66 at 9) (quoting *In re Toyota Motor Corp.*, 790 F. Supp. 2d 1152, 1175 (C.D. Cal. 2001)). Plaintiffs assert performance of the arbitration agreement is impossible because it designates an arbitration forumm and rules that do not exist. *Id.* Impossibility of performance is an affirmative defense, and the burden of proof lies on the party asserting the defense. *Hensler v. City of Los Angeles*, 124 Cal. App. 2d 71, 83 (1954). Under California law,

> In order to be an excuse for nonperformance of a contract, the impossibility of performance must attach to the *nature of the thing to be done* and not to the inability of the obligor to do it. [Citation.] One who binds himself to a contract which cannot be formed without the consent or cooperation of a third party is not relieved of liability because of his inability to secure the required consent or cooperation. [Citation.] The courts hold that this is merely subjective impossibility, which does not excuse nonperformance of a contract. [Citation.]

*Id.*, emphasis added, citations omitted. The defense of impossibility does not concern inability or unwillingness on the part of the promissor to perform under the contract. *Id.* Here, the "nature of the thing to be done" is arbitration, and impossibility does not attach to the procedure by which the arbitration is accomplished. Consequently, Plaintiffs have failed to show that impossibility excuses performance of the arbitration agreement.

### *b. The defense of mutual mistake does not preclude enforcement of the agreement*

Generally, a mistake of fact consists of a "[b]elief in the present existence of a thing material to the contract, which does not exist . . . " Cal. Civ. Code § 1577. Plaintiff contends that this

---

[5] Plaintiff bears the burden on proving the arbitration agreement is unenforceable. *See Ladd v. Warner Bros. Entertainment, Inc.*, 184 Cal. App. 4th 1298, 1309 n. 7 (Cal. App. 2d Dist. 2010) quoting *Walton v. City of Red Bluff*, 2 Cal.App.4th 117 131 (Cal. App. Ct. 2010)

11

mistake, requiring the arbitration to proceed according to the rules of the AAS, precludes enforcement of the arbitration agreement.  However, Defendant IE(LA) asserts the arbitration agreement is enforceable despite the unavailability of the AAS, and urges the Court to reform the agreement and direct the GAR and IE(LA) to proceed to arbitration.  (Doc. 51-1 at 4-5).  Under California law, courts enjoy "inherent limited authority to reform contracts." *Armendariz v. Foundation Health Psychcare Servs., Inc.* 24 Cal.4th 83, 125 (2000), *abrogated in part on other grounds by AT&T Mobility LLC v. Concepcion*, 131 S.Ct. 1740 (2011).

In particular, the Court has the authority to reform a contract where there has been a mistake by the parties. *Kolani v. Gluska,* 64 Cal.App.4th 402 (Cal. App. 2d Dist. 1998).  "When, through . . . mistake . . ., a written contract fails to express the real intention of the parties, such intention is to be regarded, and the erroneous parts of the writing disregarded." (Cal. Civ. Code, § 1640.) "[A] mutual mistake of the parties," justifies a written contract being "revised, on the application of a party aggrieved, so as to express that intention, so far as it can be done without prejudice to rights acquired by third persons, in good faith and for value." (Cal. Civ. Code § 3399.)  To reform the agreement, the Court may "transpose[], reject[], or suppl[y]" words but reformation is limited to achieving the parties' intent at the making of the contract. *Hess v. Ford Motor Co.*, 27 Cal. 4th 516, 524 (Cal. 2002)

Notably, where named arbitrators could not or would not proceed, district courts have appointed replacement arbitrators. *See, e.g., McGuire, Cornwell & Blakey v. Grider*, 771 F. Supp. 319, 329 (D. Colo. 1991) ("as a general rule, when the arbitrator named in the arbitration cannot or will not arbitrate the dispute, a court does not void the agreement but instead appoints a different arbitrator"). Likewise, as Defendant IE(LA) notes, courts have reformed arbitration agreements that designated non-existent arbitration rules. (Doc. 67 at 5) (citing *HZI Research Ctr., Inc. v. Sun Instruments Japan Co.*, 1995 U.S. Dist. LEXIS 13707, 1995 WL 562181 (S.D.N.Y. Sept. 20, 1995) ("If the parties imperfectly or incorrectly designate the instrumentality through which arbitration should be effected, the court will enforce the contract by making an appropriate designation"); *Sankey v. Sears, Roebuck & Co.*, 100 F.Supp.2d 1290, 1297-98 (Ala. 2000)).

Though Plaintiffs cite state law authority for the proposition that a replacement arbitrator may not be named by the Court, they fail to note that this is *only* where the use of the named arbitrator was integral to the contract. *Provencio v. MWA Sec., Inc.,* 125 Cal.App.4th 1028, 1032 (Cal. Ct. App. 2005) Though *Provencio* presumes the mere naming of a forum in the arbitration agreement makes it an integral term it does so without analysis and the Court here cannot do so.[6] For example, in *Reddam v. KPMG LLP*, 457 F.3d 1054, 1061 (9th Cir. 2003) overruled on other grounds in *Atl. Nat'l Trust LLC v. Mt. Hawley Ins. Co.*, 621 F.3d 931, 940 (9th Cir. 2010), the Ninth Circuit determined that an arbitration agreement is unenforceable due to the unavailability of the selected forum only when the selected forum was integral to the agreement. The Court instructs,

> When a court asks whether a choice of forum is integral, it asks whether the whole arbitration agreement becomes unenforceable if the chosen arbitrator cannot or will not act.
> 'Only if the choice of forum is an integral part of the agreement to arbitrate, rather than an 'ancillary logistical concern' will the failure of the chosen forum preclude arbitration.'

*Id*.

Here, the parties agree that the American Arbitration Society which, apparently, had been located in Bakersfield, California, is defunct. Likewise, whether the rules of this society ever existed is unknown to either party. (Doc. 51-1 at 4, n. 4; Doc. 51-5 at 2) However, the material portion of the agreement is the *commitment to arbitrate* the claims. There is no evidence the parties' agreement to arbitrate depended on the use of the AAS's rules, or that a material term of the arbitration agreement was the use of these rules. To the contrary, it is apparent that neither party *has ever seen the rules* of the American Arbitration Society nor had any meaningful knowledge or contact with the AAS.[7] *Id.* In fact, in their earlier communications, Plaintiffs asserted, "The 'main purpose' of the arbitration provision in the Confidentiality Agreement is for the parties to resolve disputes through binding arbitration. The use of the 'Arbitration Rules of the American Arbitration Society' is only

---

[6] Interestingly, for this proposition, *Provencio* relies upon *Alan v. Superior Court*, 111 Cal.App.4th 217, 224-226 (Cal. Ct. App. 2003). However, both *Alan* and the case it relied upon, *In re Saloman Inc. Shareholders' Derivative Lit.*, 68 F.3d 554 (2d Cir. 1995), both involved situations where the arbitration agreements indicated that the matter could be arbitrated *only* by the named arbitrator. That was not the situation in *Provencio* and it is not the situation here.

[7] The Court notes also that pre-filing, Plaintiffs took the position that the lack of arbitration rules was severable and did not invalidate the arbitration agreement. At oral argument, counsel explained that their earlier research indicating that the arbitration agreement was enforceable, was in error.

'collateral' to the main purpose of that provision." (Doc. 33-2 at 9.) Thus, the Court does not find that the selection of the AAS or its rules were an integral part of this arbitration agreement.

Moreover, under 9 USCS § 206, the Court has the authority to select an arbitrator for the parties. This section reads,

> A court having jurisdiction under this chapter [9 USCS §§ 201 et seq.] may direct that arbitration be held in accordance with the agreement at any place therein provided for, whether that place is within or without the United States. **Such court may also appoint arbitrators in accordance with the provisions of the agreement**.

*Id*., emphasis added. Consequently, the Court finds it has the power to reform the agreement to identify the arbitrator and the rules that will govern the arbitration.

Defendants urge that the Court to order the parties to arbitration which will br conducted by the American Arbitration Association and according to its rules. Defendants note that the AAA has a stellar reputation in the legal community and have been described by legal commentators as the "gold standard for fundamentally fair arbitrations." (Doc. 51-1 at 10-11.) Defendants cite to Ninth Circuit and California decisions in which courts have determined that the rules of the AAA and the arbitrators suppled by it, are neutral and fair. *Id*. at 11.  In their briefing, Plaintiffs offer no alternative organization and remain steadfast in the position that no arbitration association may arbitrate these claims other than the defunct organization identified in the agreement.[8]

However, to most closely approximate the parties' intent when forming the arbitration agreement, the Court recommends that each side be required to select an arbitrator and then the two selected, select the third.  The Court recommends further that the panel of arbitrators determine the rules by which the arbitration will proceed and determine the location of the arbitration.

        2.   <u>The agreement encompasses disputes at issue</u>.

To determine whether an arbitration agreement encompasses particular claims, the Court looks to the plain language of the agreement, and "[i]n the absence of any express provision excluding a particular grievance from arbitration . . . only the most forceful evidence of a purpose to exclude the claim from arbitration can prevail." *United Steelworkers of Am. v. Warrior & Gulf*

---

[8]This argument would have more persuasive force if either party to the agreement relied upon this term.

*Navigation Co.*, 363 U.S. 574, 584-86 (1960).  Here, Plaintiffs allege fraudulent acts and breach of the Confidentiality Agreement. (Doc. 26).  The arbitration agreement specifies that it encompasses "[a]ny dispute arising out of or relating to" the Confidentiality Agreement.  (Doc. 26, Exh. F at 4). Based upon this broad specification of the parties, it is clear that Plaintiffs' claims relating to the Confidentiality Agreement are encompassed in the dispute.

### 3. The entire dispute should be arbitrated.

Defendants agree that almost all of this dispute should be ordered to arbitration.  (Doc. 51-1 at 7-8.) Defendants assert that all claims related to the Confidentiality Agreement, including breach, breach of the covenant of good faith and fair dealing implied, unjust enrichment, and fraud, should be arbitrated. *Id*.  They contend, however, that all claims related to the Consulting Agreement should not be referred to arbitration.

Undoubtedly,

> Arbitration is contractual by nature–"a party cannot be required to submit to arbitration any dispute which he has not agreed so to submit." *United Steelworkers of America v. Warrior & Gulf Navigation Co.*, 363 U.S. 574, 582, 4 L. Ed. 2d 1409, 80 S. Ct. 1347 (1960). Thus, while there is a strong and "liberal federal policy favoring arbitration agreements," *Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth, Inc.*, 473 U.S. 614, 625, 87 L. Ed. 2d 444, 105 S. Ct. 3346 (1985) (quotations omitted), such agreements must not be so broadly construed as to encompass claims and parties that were not intended by the original contract. "**It does not follow, however, that under the [Federal Arbitration] Act an obligation to arbitrate attaches only to one who has personally signed the written arbitration provision**." *Fisser v. International Bank,* 282 F.2d 231, 233 (2d Cir. 1960); see also *Deloitte Noraudit A/S v. Deloitte Haskins & Sells*, U.S., 9 F.3d 1060, 1064 (2d Cir. 1993).

*Thomson-CSF, S.A. v. American Arbitration Ass'n*, 64 F.3d 773, 776 (2d Cir. N.Y. 1995), emphasis added. Nevertheless, Defendants ground their argument on the fact that only IE LA was a signatory to the Confidentiality Agreement.  However, as recited above, the Confidentiality Agreement was expressly designed to substitute for all prior agreements related to confidential information provided by GAR to IE(LA). (Doc. 49-1 at 43-44). A reasonable interpretation is that this new agreement was intended to be a modification of the Consulting Agreement's confidentiality provision. (Doc. 49-1 at 43-44, 61-62)

On the other hand, in many instances, the Confidentiality Agreement *required* IE(LA) to obtain a similar confidentiality agreement from those to whom the information was disclosed and

that these new agreements *would be enforceable by GAR*. (Doc. 49-1 at 61) This demonstrates that an improper disclosure was intended by the parties to be borne not only by IE(LA), but in many instances also by the party to whom IE(LA) disclosed the information.

Nevertheless, Defendants argue that only IE(LA) signed the confidentiality agreement and, therefore, the other Ivanhoe entities, including Ivanhoe Energy Inc., cannot be required to arbitrate. The assert that only an "extraordinary relationship" between the signatories and non-signatories, may force non-signatories into arbitration.[9] However, as noted above, non-signatories may be required to arbitrate under the agreement "under ordinary contract and agency principles." *Comer v. Micor, Inc.*, 436 F.3d 1098, 1101 (9th Cir. 2006); *NORCAL Mutual Ins. Co. v. Newton*, 84 Cal.App.4th 64, 76 (Cal. Ct. App. 2000).

Indeed, equitable principles "preclude[ ] a party from claiming the benefits of a contract while simultaneously attempting to avoid the burdens that contract imposes." *Mundi v. Union Sec. Life Ins. Co.*, 555 F.3d 1042, 1045-1046 (9th Cir. Cal. 2009) quoting *Wash. Mut. Fin. Group, LLC v. Bailey*, 364 F.3d 260, 267 (5th Cir. 2004)). Under this scenario, a nonsignatory may be bound by an arbitration clause "where the nonsignatory 'knowingly exploits the agreement containing the arbitration clause despite having never signed the agreement.'" *Mundi*, at 1045-1046 quoting *E.I. DuPont de Nemours & Co. v. Rhone Poulenc Fiber & Resin Intermediates*, 269 F.3d 187, 199 (3d Cir. 2001).

Here, Plaintiffs' allege a classic shell game that claims that the non-signatory defendants absolutely took full advantage of the benefits of the Confidentiality Agreement executed by IE(LA) and GAR. In essence, the First Amended Complaint alleges that Ivanhoe issued to GAR the Consulting Agreement which would assist Ivanhoe in exploiting the oil exploration opportunities in Ecuador. Soon thereafter, Ivanhoe created a new entity, IE(LA) to whom it assigned the GAR

---

[9] For this proposition, Defendants rely upon *Comedy Club, Inc. v. Improv West Assocs.*, 553 F.3d 1277 (9th Cir. 2009) which, in turn, relies upon *NORCAL*. *NORCAL* specifically holds that an agency or similar relationship would be sufficient to justify the order requiring the non-signatory to arbitrate the dispute. "The common thread . . . is the existence of an agency or similar relationship between the nonsignatory and one of the parties to the arbitration agreement. In the absence of such a relationship, courts have refused to hold nonsignatories to arbitration agreements." *NORCAL* at 76.

contract. IE(LA) assured GAR of its fidelity by providing a letter that demonstrated that GAR represented, not just IE(LA), but *all* of the affiliated Ivanhoe companies. Then GAR and IE(LA) executed additional contracts clarifying the duties created by the Consulting Agreement but confined the liability for the duties owed to GAR, to IE(LA). A short time later, a key person at Ivanhoe and IE(LA) told GAR that Ivanhoe was not interested in Ecuador. Thus, GAR moved on to other opportunities. Around this same time, Ivanhoe created other companies (Ivanhoe Energy Latin American Inc. and Ivanhoe Energy Ecuador Inc.), which were not bound by any of the existing agreements with GAR. These companies then used confidential information provided by GAR which allowed Ivanhoe to pursue and ultimately secure, the very opportunities that GAR was retained to assist in obtaining. The contracts with GAR expired and, by moving the shell faster than GAR could follow, Ivanhoe and its affiliates obtained a fabulous benefit without any obligation to GAR. Thus, unlike in *Comer*, the very heart of the dispute here is whether the affiliated companies took full advantage of the Confidentiality Agreement without assuming the obligation to arbitrate, for the purpose of avoiding the obligations of the Consulting Agreement. Given this, the entire dispute and all parties to this litigation should be required to arbitrate.

Defendants' suggestion that GAR should be required to arbitrate only against IE(LA) and the Court handle the balance of the dispute, is poor for many reasons. First, there is a potential for inconsistent factual determinations related to the conduct of GAR and IE(LA). Second, it would render meaningless the agreement to arbitrate. Notably, in *J.J. Ryan & Sons, Inc. v. Rhone Poulenc Textile, S.A.*, 863 F.2d 315, 320-321 (4th Cir. S.C. 1988), the Court held,

> When the charges against a parent company and its subsidiary are based on the same facts and are inherently inseparable, a court may refer claims against the parent to arbitration even though the parent is not formally a party to the arbitration agreement. As the Fifth Circuit explained under similar circumstances, "If the parent corporation was forced to try the case, the arbitration proceedings would be rendered meaningless and the federal policy in favor of arbitration effectively thwarted." Sam Reisfeld & Son Import Company v. S. A. Eteco, 530 F.2d 679, 681 (5th Cir. 1976). The same result has been reached under a theory of equitable estoppel. See McBro Planning and Dev. Co. v. Triangle Elec. Constr. Co., 741 F.2d 342 (11th Cir. 1984).

Therefore, the Court recommends that the entire dispute and all parties to this case be compelled to arbitrate.[10]

## IV. ORDER

Based upon the foregoing, the motion to remand the matter to the Kern County Superior Court, is **DENIED**.

## V. FINDINGS AND RECOMMENDATIONS

Furthermore, consistent with the analysis set forth above, it is **HEREBY RECOMMENDED** that:

1. The motion to compel arbitration be **GRANTED** as to all claims and all parties;
2. Within 21 days of the date the Court adopts these Findings and Recommendations, each side be **ORDERED** to select one arbitrator and the two selected arbitrators then select the third arbitrator and that this panel determine the rules by which the arbitration will proceed and the location of the arbitration;
3. This matter be **STAYED** to allow the completion of the arbitration;.
4. The Court retain jurisdiction to confirm the arbitration award and enter judgment for the purpose of enforcement.

These Findings and Recommendations are submitted to the United States District Judge assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(1)(B) and Rule 304 of the Local Rules of Practice for the United States District Court, Eastern District of California. Within 14 days after being served with these Findings and Recommendations, any party may file written objections with the court. Such a document should be captioned "Objections to Magistrate Judge's Findings and Recommendations."

///

///

---

[10] For the same reasons, the Court would find that the apparent agency relationship between the affiliated companies would justify its recommendation that the entire dispute be compelled to arbitration. Likewise, given the allegations of fraud set forth in the First Amended Complaint, the alter ego theory would justify an order requiring the affiliated companies to arbitrate. *Thomson*, at 777.

1 | The parties are advised that failure to file objections within the specified time may waive the
2 | right to appeal the District Court's order.  *Martinez v. Ylst*, 951 F.2d 1153 (9th Cir. 1991).

4 | IT IS SO ORDERED.

5 | Dated:   **December 23, 2011**                                         /s/ Jennifer L. Thurston
                                                                       UNITED STATES MAGISTRATE JUDGE